NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0377-20
A-0437-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

FUQUAN K. KNIGHT,
a/k/a FUQUAN K. KNIGHT, JR.,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SHAQUAN K. KNIGHT,
a/k/a SHAQUAN KYLE, and
SHAQUAN KYLEKNIGHT,

     Defendant-Appellant.

_____

> Submitted (A-0377-20) and Argued (A-0437-21)
> November 6, 2023 – Decided December 21, 2023
>
> Before Judges Sabatino, Marczyk, and Chase.
>
> On appeal from the Superior Court of New Jersey, Law
> Division, Essex County, Indictment No. 19-01-0010.

Joseph E. Krakora, Public Defender, attorney for appellant Fuquan K. Knight (Andrew R. Burroughs, Designated Counsel, on the briefs).

Morgan A. Birck, Assistant Deputy Public Defender, argued the cause for appellant Shaquan K. Knight (Joseph E. Krakora, Public Defender, attorney; Morgan A. Birck, of counsel and on the briefs).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent State of New Jersey in A-0377-20 (Caitlinn Raimo, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

Hannah Faye Kurt, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent State of New Jersey in A-0437-21 (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Hannah Faye Kurt, of counsel and on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

These two appeals, which we consolidate for purposes of this opinion, arise out of a joint trial in which two brothers, Fuquan K. Knight (defendant in A-377-20) and Shaquan K. Knight (defendant in A-437-21), were found guilty by a jury of armed robbery and other offenses.[1]  The State's proofs showed that

---

[1]  For sake of clarity, we refer to defendants and their father by their first names in this opinion; no disrespect is intended.

defendants, along with their father Kyler Knight, robbed the victim behind a deli, threatening him with a knife and at gunpoint. The victim identified defendants to the police as two of the three robbers, confirming his identification of them at a pretrial Wade[2] hearing.

The victim died of unrelated causes before trial, but his earlier testimony at the Wade hearing and his post-robbery 9-1-1 call to the police were presented to the jury over defendants' objection. Other evidence substantiated defendants' guilt, including, among other things, surveillance videos that recorded events inside and outside the deli, as well as incriminating items seized by police from their residence. Defendants did not call witnesses or testify at trial, but disputed the victim's identification and their involvement in the robbery.

The trial court sentenced Fuquan, who was twenty-seven at the time of the robbery, to an aggregate custodial term of sixteen years. The judge sentenced Shaquan, who was nineteen at the time of the robbery, to a term of eleven years. Both sentences were subject to an eighty-five percent parole ineligibility period under the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2. Defendants raise substantially overlapping issues on appeal, contesting their convictions and respective sentences.

---

[2] United States v. Wade, 388 U.S. 218 (1967).

A-0377-20

A key issue raised by both defendants is whether the trial court erred by allowing the jury to observe multiple times, in slow motion and with pauses, an approximately six-second segment of a surveillance video. That video, which was filmed through a glass door in the rear of the deli, shows the victim quickly being escorted by the three culprits outside the building. One culprit appears to be pointing a firearm at the victim, and another appears to be pushing defendant forward. The State presented the video as part of its case-in-chief without objection, and then played it again several times in closing argument without objection, once in slow motion. During both days of their deliberations, the jurors requested the video to be replayed several more times, in slow motion and at other varying speeds and with intermittent pauses. The trial judge permitted those jury playbacks under her supervision in the courtroom, over defendants' objection.

Defendants contend they were unduly prejudiced by these video playbacks, citing research indicating that slow-motion presentations can increase a viewer's perception or inferences of intentional conduct. To date, there are no published New Jersey opinions that address the question.

As a matter of first impression, we hold that—subject to offsetting concerns of undue prejudice—surveillance video footage may be presented to jurors in slow motion or at other varying speeds, or with intermittent pauses, if

4

the trial court in its discretion reasonably finds those modes of presentation would assist the jurors' understanding of the pertinent events and help them resolve disputed factual issues. We further hold—again subject to offsetting concerns of undue prejudice—that trial courts in their discretion may grant a jury's requests during deliberations to replay the videos in such modes one or more times, provided that the playbacks occur in open court under the judge's supervision and in the presence of counsel.

We discern no reversible error concerning the video playbacks in this case, which would have aided the jurors in resolving the parties' disputes over the robbers' identities and their respective actions with the victim behind the deli. Going forward, we offer several non-exclusive factors to guide the court when considering whether to allow videos to be shown in varying speeds or with intermittent pauses during the trial and summations, and on a jury's request during deliberations. We further recommend that the Model Criminal Jury Charge Committee consider crafting an instruction to guide jurors when surveillance videos are presented in such modes.

In the unpublished portion of this opinion, we conclude defendants' remaining arguments to set aside their convictions are unpersuasive, although we remand solely for reconsideration of their sentences.

5

I.

The facts relating to the robbery are largely based on the victim's testimony at the <u>Wade</u> hearing, as well as the surveillance videos played at trial.

A.    <u>Wade Hearing</u>

On October 11, 2018, the victim, Thaddeus Osbourne, went to Poppie's Deli[3] in East Orange to cash a betting slip. He had won $500 in cash. As was later revealed, Osbourne was also at the deli to buy marijuana.

Shaquan was at the deli, wearing a black hoodie with white letters on it. Osbourne identified him at the <u>Wade</u> hearing, stating that he knew Shaquan from the neighborhood and had bought marijuana from him once before. While inside the deli, Shaquan offered to sell marijuana to Osbourne, and, when Osbourne tried to pay him, Shaquan told him to walk outside because it was "too hot," meaning there were too many police around.

As Osbourne followed Shaquan outside to the rear of the deli, a man grabbed him, pushed him towards the back of the building, and held a knife to his neck. Another person held a gun to his face. Osbourne later identified the person with the knife as Kyler, describing him as a shorter "older guy" with a

---

[3] The store in question was referred to in the record as Poppie's, Poppy's, and Poppie's Deli. For the sake of consistency, we refer to it as Poppie's.

beard, dark skin, and a burgundy hoodie.  He identified Fuquan as the person with the gun, stating he had dreadlocks and wore a black and gold hoodie.

Osbourne said the gun was black with a brown handle, and approximately shoulder width in length.[4]  He never saw the knife, but only felt it against his neck.  According to Osbourne, while he was held at gunpoint and knifepoint, Shaquan patted him down, searched his pockets, and took his keys and wallet.

Osbourne testified that an observer in a parking lot yelled at defendants to "stop or whatever."  Kyler yelled back that Osbourne owed them money, which made the observer "mind his business or whatever."  When the robbery was completed, defendants ran off and Osbourne yelled to them asking for his keys, which defendants threw back to him.

After the robbery, Osbourne said that he briefly followed defendants— observing that they headed towards Princeton Street—and then returned to his home on Evergreen Place and called 9-1-1.  Osbourne told the operator that he had been robbed and that he did not know the perpetrators.[5]  During cross-examination, Osbourne agreed he had lied about not knowing the robbers, but

---

[4]  The State contended it was a sawed-off shotgun.

[5]  The 9-1-1 call, which we discuss in Part III, was played for the jury.

then clarified that he did not know them personally and did not know their names.

When the police arrived, they drove Osbourne back to Poppie's and watched the surveillance video together inside the deli. Osbourne identified one of the suspects in the video (Shaquan) and provided the police with descriptions of all three suspects. The police then transported Osbourne to the station and obtained a recorded statement, which included photo identifications of Fuquan and Shaquan. Osbourne testified that although he did not know their names, he had previously seen Shaquan five or six times, had purchased marijuana from him once before, and had seen Fuquan with Shaquan once.

Osbourne initially told the police that he had left Poppie's and was walking to his car when he was robbed. However, during his testimony, he agreed that he had lied about this, and that he had been trying to buy marijuana. Although he did not tell the police this during his original statement, he claimed that he had mentioned this detail to an unnamed police officer while at the station. He also stated that he never brought up this detail again, until the day before the Wade hearing, when he disclosed this fact to the prosecutor's office. He explained that he had not mentioned the marijuana because he thought it was irrelevant. A few days later, Osbourne returned to the station and identified Kyler's photograph as depicting the third suspect.

8

B.    The Investigation

Officer Hassan Gafaar was one of the police who initially responded to the robbery. Osbourne described to Officer Gafaar the robbery and the suspects, whom he then portrayed as strangers. Gafaar first took Osbourne to Poppie's, where they reviewed the surveillance video, and then drove him to police headquarters for a statement.

At headquarters, the lead detective assigned to the case, Felix Lantigua, met with Officer Gafaar and Osbourne. This conversation was not recorded, and it was meant to gather "the basics" of the incident, including what happened, a description of the suspects' clothing, and what weapons they used.

Next, Detective Lantigua canvassed the area to locate surveillance cameras. Law enforcement collected videos from the interior of Poppie's and from a liquor store neighboring Poppie's, which showed the front and back of the deli. After watching the videos, Lantigua recognized Shaquan, whom he knew from the community. At some point Lantigua also identified Fuquan as the suspect in the black and gold top. Based on his familiarity with Fuquan and Shaquan, Lantigua collected photos of them for Osbourne to view. During his later testimony, the detective also identified Kyler as the suspect in the burgundy sweatshirt.

A-0377-20

Detective Lantigua then took a formal statement from Osbourne. During this statement, Osbourne did not disclose that he had cashed in a bet or had attempted to buy marijuana from Shaquan. According to Lantigua, Osbourne said "he was familiar with two of the suspects from having encounters numerous times in the area." Based on this information, Lantigua presented Osbourne with the two photos of Fuquan and Shaquan. He described this procedure as a "one on one" photo array, and said it was an appropriate identification method if the witness was familiar with the suspects, as Osbourne was. Osbourne identified both defendants as the robbers.

Based on these identifications, Lantigua obtained arrest warrants for Fuquan and Shaquan. Lantigua went to defendants' home to arrest them, but only Kyler was present.[6] Lantigua "immediately" recognized Kyler as the third suspect, based on his facial hair and because "he walked with a limp." However, he did not immediately arrest Kyler because he was not "familiar with [him] and neither was the victim."

Lantigua then asked an officer to generate a six-photo array for Kyler, which Sergeant Stephen M. Rochester administered. Osbourne positively identified Kyler's photograph. Consequently, Lantigua obtained an arrest

---

[6] It appears from testimony that defendants' home was located within a few blocks of the deli.

A-0377-20

warrant for Kyler and attempted to effectuate the warrant that same day, but no one was home. He went back to defendants' home that evening to retrieve surveillance footage from the shared spaces in the home, which was a multi-family residence. After reviewing this surveillance footage, Lantigua obtained a search warrant for defendants' unit.

Two days later, Lantigua and other officers effectuated the search warrant at defendants' residence. They found clothing that matched the garments apparently worn during the robbery by Shaquan and Kyler, as well as a wallet containing Osbourne's identification cards and debit card. The officers did not retrieve a gun, knife, or the clothing apparently worn by Fuquan.

C. The Indictment and Pretrial Events

In January 2019, a grand jury indicted Fuquan on the following four counts: (1) second-degree conspiracy to commit robbery against Osbourne, N.J.S.A. 2C:5-2(a)(1); (2) first-degree armed robbery, N.J.S.A. 2C:15-1; (3) third-degree unlawful possession of a shotgun, N.J.S.A. 2C:39-5(c)(1); and (4) second-degree possession of a shotgun for an unlawful purpose, N.J.S.A. 2C:39-

11

4(a). Shaquan was similarly indicted on only the first two counts and not the weapon possession charges.[7]

In October 2019, the court held a <u>Wade</u> hearing on defendants' motion to suppress Osbourne's out-of-court identification of Fuquan and Shaquan, which involved a single-photo array of each defendant. In addition to describing the robbery and subsequent events at the hearing, Osbourne testified that he knew Fuquan and Shaquan from around the neighborhood and acknowledged he had purchased drugs from Shaquan once in the past.

After the <u>Wade</u> hearing, the court ruled that Osbourne's prior identifications were admissible, finding that Osbourne was truthful, the surveillance videos showed that Shaquan and Osbourne knew each other, and consequently the trial court found it was appropriate for the police to have shown Osbourne a single-photo array when identifying Fuquan and Shaquan.

On November 13, 2019, the State notified the court that Osbourne had passed away. While his cause of death was unknown, defendants were not

---

[7] Defendants' father, Kyler, also was charged but was not tried with defendants because he was being held out-of-state on different charges. Kyler did not participate in any aspect of this proceeding, and he subsequently pled guilty to second-degree conspiracy to commit a robbery or bodily injury, N.J.S.A. 2C:5-2(a)(1), 2C:15-1(a)(2), and third-degree possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4(d), and was sentenced to a six-year term.

implicated in his passing. The court subsequently granted the State's application to admit Osbourne's <u>Wade</u> testimony at trial under N.J.R.E. 804(b)(1)(A) (prior testimony of an unavailable witness), finding that defendants had a sufficient opportunity to cross-examine Osbourne at the <u>Wade</u> hearing and had a similar motive in conducting this cross-examination.

D.    The Trial

Trial commenced six days later on November 19, 2019, and continued for three non-consecutive days, concluding with testimony on December 4, 2019. The State's proofs included Osbourne's testimony at the <u>Wade</u> hearing and his 9-1-1 call to the police, surveillance video footage taken at and near the deli, the incriminating clothing and victim's wallet found at defendants' residence, and the testimony of police and civilian witnesses.

Defendants did not testify or present any witnesses. Through his attorney, Fuquan disputed whether Osbourne was robbed, and, if so, whether he took part in such a robbery. He also disputed possessing a firearm.

Shaquan's counsel acknowledged that his client had an interaction with Osborne that day inside the deli, but that he denied taking part in robbing Osbourne outside. In summation, Shaquan's attorney argued that even if Shaquan was one of the three men shown on video with Osbourne behind the building, Shaquan was merely present and was not taking part in any

13

wrongdoing. The State, meanwhile, characterized Shaquan as the mastermind of the robbery.

In the afternoon of its second day of deliberations, the jury informed the court that it was at a "standstill" on one charge and requested guidance should it be unable to reach a decision. The court instructed the jury to continue deliberating, and thirty minutes later, the jury delivered a guilty verdict on all charges.

E.    Sentencing

On February 18, 2020, the court sentenced Fuquan to an aggregate term of sixteen years, and Shaquan to an aggregate term of eleven years. We discuss those sentencing details below in Part V.

II.

Fuquan argues on appeal:

> POINT I
>
> THE TRIAL COURT DENIED DEFENDANT'S SIXTH AMENDMENT CONFRONTATION RIGHTS WHEN IT PERMITTED THE INTRODUCTION OF THADDEUS OSBORNE'S WADE HEARING TESTIMONY AT TRIAL.
>
> POINT II
>
> THE TRIAL COURT DENIED DEFENDANT'S CONFRONTATION RIGHTS WHEN IT

PERMITTED THE INTRODUCTION OF A TESTIMONIAL 9-1-1 CALL AT TRIAL.

POINT III

THE TRIAL COURT ERRED WHEN IT PERMITTED THE 9-1-1 CALL TO BE PLAYED UNDER THE EXCITED UTTERANCE EXCEPTION TO THE HEARSAY RULE.

POINT IV

THE TRIAL COURT DENIED DEFENDANT HIS RIGHT TO A FAIR AND RELIABLE TRIAL WHEN IT PERMITTED SURVEILLANCE VIDEO RECORDINGS TO BE REPLAYED IN SLOW MOTION AND PAUSED MULTIPLE TIMES OVER DEFENDANT'S OBJECTION.

POINT V

THE TRIAL COURT ERRED WHEN IT FAILED TO ACCEPT A PARTIAL VERDICT.

POINT VI

THE TRIAL COURT'S CUMULATIVE ERRORS DENIED DEFENDANT A FAIR TRIAL.

POINT VII

THE [SIXTEEN]-YEAR SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE GIVEN THE UNIQUE FACTS OF THE CASE.

Meanwhile, Shaquan argues on appeal:

POINT I

THE TRIAL COURT COERCED A VERDICT WHEN IT MADE CLEAR THE TRIAL WOULD END ON DECEMBER 6 AND REFUSED TO TAKE A PARTIAL VERDICT ON THAT DATE.

POINT II

THE ADMISSION OF THE VICTIM'S WADE HEARING TESTIMONY WAS HEARSAY AND VIOLATED DEFENDANT'S RIGHT TO CONFRONTATION.

POINT III

THE ADMISSION OF THE 9-1-1 CALL WAS ALSO HEARSAY THAT VIOLATED DEFENDANT'S CONFRONTATION RIGHTS.

POINT IV

THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON ONE-ON-ONE IDENTIFICATIONS OR LACK OF A BLIND ADMINISTRATOR.

POINT V

THE TRIAL COURT ERRED IN ALLOWING THE SURVEILLANCE FOOTAGE TO BE PLAYED IN SLOW MOTION.

POINT VI

THE SENTENCE WAS THE RESULT OF AN IMPERMISSIBLE TRIAL PENALTY AND IS

16

EXCESSIVE WHEN COMPARED TO THE CODEFENDANT'S—HIS FATHER—SENTENCE OF SIX YEARS OF INCARCERATION.

We address these issues in a reorganized sequence.

### III.

The first issue we address—a novel one under our case law—concerns the repeated playback of the surveillance video footage in slow motion and at other varying speeds, and in intermittent-pause modes.

### A.

The State played several surveillance videos during the trial, including videos from the interior of Poppie's, from a neighboring property showing different angles of the exterior of Poppie's, and from defendants' residence. The key video at issue here is exhibit S-31, which shows a rear view of Poppie's interior, including its back door which offered a brief glimpse into the back parking lot where the robbery took place. The video has no audio track.[8]

Starting at 11:41:38, the video shows four men walking by the back door. The video appears to show Osbourne, closely followed by a man the State contended was Kyler, who seemed to be holding onto Osbourne by the neck or

---

[8] We have reviewed the video evidence as part of our consideration of the issues raised on appeal. The approximate six-second segment in which the four men are filmed passing by Poppie's rear door is the most pertinent.

A-0377-20

shoulder. Walking behind them is another man, who the State contended was Fuquan, holding a black and brown object in one hand. The last man walking in the group allegedly is Shaquan, who does not appear to be holding anything. The robbery apparently occurred off-camera.

The jurors first were shown this portion of the video (from 11:41:30 to 11:43:05) during the State's case-in-chief, seeing it once at normal speed.

Later, during their summations, defendants did not replay any of the videos for the jury. However, Shaquan's attorney told the jury that the State would likely play the videos in slow motion during its own summation.

As anticipated, the State replayed in closing argument numerous sections of the videos, mostly at normal speed, and with a few sections fast-forwarded. The State also played in slow motion and with pauses the video showing the rear of Poppie's. Defendants did not object to that presentation.

On the first day of deliberations, the jury made a number of requests. They asked to review several of the surveillance videos, hear the 9-1-1 call again, and review Osbourne's Wade testimony. All counsel and the court agreed with Shaquan's attorney's position that the video should be played at normal speed, "[u]nless," the court added, "they ask for something different."

Before the playback took place, the jury amended its request and asked for a replay only of the video from the rear interior of Poppie's, requesting that

it be replayed "at least three times, slowly and pause[d]" at 11:41:41, the point when the men the State claimed to be Fuquan and Shaquan walked by the back door. At this point, Fuquan's attorney objected, arguing that case law required the video to be played in the same way as it had been presented at trial. The court asked counsel to use the lunch break to research this point. Following the lunch break, Fuquan's attorney said he was unable to find the case law but presented studies about how playing videos in slow motion "increase[d] the likelihood of conviction." Shaquan's attorney relied on Fuquan's arguments on this point.

The State contended the articles cited by the defense were unreliable "junk science," and that playing the videos in slow motion was not interfering with the jury's function but instead was honoring their request. The court disagreed that the studies constituted junk science, but found that defendants' arguments were not supported by case law, and as a trial court, it was not in a position to create new law.

Consequently, the court permitted the deliberating jurors to view the videos in slow motion, as they requested. Before doing so, the court directed the jury to select a "pauser," designating a juror to direct the State when to pause,

19

rewind, and replay the video.[9] The State then played the video for the jury that day a total of ten times, at varying speeds and starting points.

On the second day of deliberations, the jury asked to see the same six-second video clip again, from 11:41:39 to 11:41:45. They specifically asked the court to play the video slowly three times, "zoomed in," and paused at 11:41:41. The State and defendants agreed they could not zoom in the video, as that would constitute altering the evidence. The judge granted the jurors' request, permitting the six-second segment of the video to be played five more times, played at a speed of five times slower, with a final pause at 11:41:41.

In total, the jurors watched portions of the video fifteen additional times,[10] mostly at slower speeds and sometimes with intermittent pauses.

On appeal, both defendants[11] argue that the court erred in allowing the jury to repeatedly view the surveillance videos in slow motion during

---

[9] Defendants did not object to the jury's designation of a pauser, and do not claim error on appeal about that designation. The transcript reflects that, when the videos were replayed in open court, another juror voiced several requests to replay the footage several times in slow motion, and those requests were also honored.

[10] The briefs calculate the total as fourteen additional times.

[11] The only significant difference between defendants' two appellate briefs is that Shaquan cites two more articles addressing the dangers of playing videos at a trial in slow motion.

A-0377-20

deliberations. They contend the deliberating jurors should have watched the video as it was presented during the trial. They assert the repeated playing of the video in slow motion and at varying speeds with intermittent pauses resulted in the jury being exposed to a "distorted reality." They further argue that, at the very least, the court should have given the jury a limiting instruction about how playing a video at different speeds can manipulate their perception. No such limiting instruction was requested, however.

### B.

As we have previously noted, there has been an "explosive growth in the number of surveillance cameras in operation."[12] State v. Watson, 472 N.J. Super. 381, 472 (App. Div. 2022), rev'd on other grounds, 254 N.J. 558 (2023). Police investigations involve "canvassing the surrounding neighborhood not just for potential suspects and eyewitnesses but also for public and privately-owned video cameras that may have captured a reported crime, the events leading up to it, or its aftermath (e.g., flight from the scene)." Ibid. Consequently, such "recordings have become a staple of criminal trials." Ibid.

---

[12] A study published in 2018 reported that, as of that time, within the United States, "there are approximately 30 million surveillance cameras shooting about 4 billion hours of footage each week." Yael Granot, et al., In the Eyes of the Law: Perception Versus Reality in Appraisals of Video Evidence, 24 Psych., Pub. Pol'y & L. 93, 94 (2018). The frequency has surely grown since that article was published.

A-0377-20

The probative value of such surveillance footage can be enormous. As our Supreme Court has recognized, "[t]he power of a video of contemporaneously recorded events at the crime scene can hardly be disputed." State v. Garcia, 245 N.J. 412, 431 (2021). "[A] video recording is a valuable tool[,]" and can "enhance[] a judge or juror's assessment of credibility by providing a more complete picture of what occurred." State v. Cole, 229 N.J. 430, 450-51 (2017) (internal citations omitted); see also Garcia, 245 N.J. at 431-32 (quoting that same observation).

The Court recently recognized that potential evidential value in State v. Watson, which involved a fifty-seven-second surveillance video that showed an entire robbery committed inside the bank. 254 N.J. 558, 570 (2023). Among other things, the video in Watson was highly relevant to the core disputed issue of identification, i.e., whether defendant was the person shown on the video demanding money from the teller, and whether the robber's fingers touched areas where fingerprints could have been left but were not found. Ibid.

Our New Jersey courts have not yet addressed in a published opinion the standards for presenting to trial jurors surveillance video footage in slow motion, assuming it satisfies the applicable requirements for authenticity, relevance, and other Rules of Evidence. In particular, we have no precedents specifically addressing the issues raised here concerning the playback of surveillance videos

22

in slow motion and in other altered modes to jurors at their request during deliberations.

Lacking precedential guidance on these discrete issues, the trial court and counsel consulted our somewhat analogous case law regulating the playback during deliberations of video-recorded or audio-recorded trial testimony. Under that case law, a court's decision to replay a recording of trial testimony for deliberating jurors is vested in the discretion of the trial judge. State v. A.R., 213 N.J. 542, 559 (2013). "Absent 'some unusual circumstance,' those requests should be granted." State v. Miller, 205 N.J. 109, 119-20 (2011) (referring to the playback of trial testimony) (quoting State v. Wolf, 44 N.J. 176, 185 (1965)).

"Generally, once an exhibit has been admitted into evidence, the jury may access it during deliberations, subject to the court's instructions on its proper use." State v. Burr, 195 N.J. 119, 133-34 (2008) (citing R. 1:8–8). Indeed, "[v]ideo playbacks of witness testimony during deliberations at the jury's request are commonplace." State v. Muhammad, 359 N.J. Super. 361, 380 (App. Div. 2003).

In Miller, 205 N.J. at 122, the Court provided guidelines for ruling on a jury's request to replay testimony. In doing so, the Court emphasized that "judges should ordinarily grant a jury's request to play back testimony." Ibid. (citing State v. Wilkerson, 60 N.J. 452, 460 (1972)). The Court's guidelines

23

emphasized replaying recorded evidence in a manner that accurately responds to the jury's request, although it also noted that trial courts "retain discretionary authority to try to narrow a jury's request" if too "extensive." Id. at 122-23.

Our case law has addressed the dangers of allowing a jury to review playbacks of previous testimony during their deliberations, and what steps courts can take to safeguard against these dangers. See, e.g., A.R., 213 N.J. at 547, 559-60; Miller, 205 N.J. at 122; Burr, 195 N.J. at 135. Those dangers include, among other things, the prejudicial repetition of the recorded footage and its potential capacity to overshadow other evidence in the case. A.R., 213 N.J. at 555. As the Court cautioned in A.R., in a context involving the video replays of a sexual assault victim's interview and video of a defendant's police interrogation recorded before trial:

> Although the video recording of a defendant's statement or a victim's statement is admissible evidence, playbacks of such testimony have the capacity to permit a jury to place undue emphasis on a single item of evidence. An audio recording permits the jury to hear every inflection, every hesitation, and every equivocation in the voice of the witness. A video recording magnifies the effect of a playback of testimony. Repeated jury review of a video recorded statement is tantamount to a second, third, or even fourth appearance of the same witness at trial.
>
> [213 N.J. at 546 (emphasis added).]

A-0377-20

In light of these concerns, the Court has imposed constraints on testimonial video playbacks. As the Court held in <u>Burr</u>, 195 N.J. at 119, and reiterated in <u>Miller</u>, 205 N.J. at 109, and again in <u>A.R.</u>, "a video-recorded statement must be replayed in open court under the direct supervision of the judge." 213 N.J. at 546-47. The trial court retains the "ultimate discretion" to deny such playback requests. <u>Id.</u> at 555 (quoting <u>Burr</u>, 195 N.J. at 135).

The context presented here is different than in those cases because there is no testimonial component to the surveillance video of the crime scene. As is frequently the case with outdoor surveillance videos,[13] the recording in this case contains no soundtrack. As such, the specific dangers of jurors affording undue weight or attention to spoken content of the recordings is not present.

Even so, we recognize there is a potential for undue prejudice that can result from repetitive showings of the videos if they are incriminating. In addition, as defendants argue, the slow motion and other modifications of the speeds at which surveillance videos are replayed might cause undue prejudice, at least in certain contexts. We proceed to explore these issues in the pages that follow.

---

[13] We do not address in this opinion the boundaries of what may be legally permissible audio to record under pertinent statutes and case law.

1.

The case law of other jurisdictions addressing the slow-motion replays have generally authorized the presentation of video evidence in that mode within the trial court's discretion, subject to offsetting considerations. For instance, in State v. Brewington, 471 S.E.2d 398, 403 (N.C. 1996), the Supreme Court of North Carolina ruled that a trial court did not abuse its discretion by allowing a criminal jury to watch a surveillance videotape of a homicide in slow motion. The Court agreed with the trial court the slow motion playing of the recording was relevant to the "critical issue" of the "sequence of events which took place at the time of the shooting." Ibid.

The Pennsylvania Supreme Court similarly held that a trial court did not abuse its discretion by allowing surveillance video footage to be played for a jury in slow motion. Commonwealth v. Cash, 137 A.3d 1262, 1277 (Pa. 2016). The Court reasoned that "playing portions of the video in slow motion enhanced the jury's understanding of the events surrounding the murder." Ibid. The video did so "by allowing [jurors] to have a better view of Appellant's face, thereby establishing Appellant's identity as the perpetrator, and by giving it the opportunity to observe that two shots had been fired from Appellant's gun, a detail which was not ascertainable when the video was played at normal speed." Ibid.

26

In that same vein, in <u>Burkhart v. Commonwealth</u>, 125 S.W.3d 848, 850 (Ky. 2003), a criminal mischief prosecution, the Supreme Court of Kentucky found no abuse of discretion in the trial court allowing a slow-motion replay of a store's surveillance video under the "controlled conditions of open court." Similarly, the Georgia Court of Appeals upheld the re-playing of video footage in slow motion as not an abuse of discretion "because the jury showed concern about it" during their deliberations. <u>Brown v. State</u>, 411 S.E.2d 366, 367 (Ga. App. 1991). <u>See also</u> <u>United States v. Plato</u>, 629 F.3d 646, 652 (7th Cir. 2010) (upholding the district court's exercise of discretion in allowing a surveillance video of a drug sale to be replayed for a jury in slow motion). Defendants have presented no contrary out-of-state published opinions holding that trial courts lack such discretion.

## 2.

Defendants cite to research indicating that the slow-motion presentation of video evidence can have the capacity to increase observers' perceptions that the conduct of the persons shown on the videos was intentional or flagrant.[14]

---

[14] Eugene M. Caruso et al., <u>Slow Motion Increases Perceived Intent</u>, 113 <u>Proceedings of the Nat'l Acad. of Scis.</u> 9250 (2016). This study has been the subject of several other articles, which have been furnished to us on appeal by defense counsel. <u>See</u> Homa Khaleeli, <u>How Slow-Motion Video Footage Misleads Juries</u>, <u>Guardian</u>, Aug. 2016; Bob Yirka, <u>Showing People Slow Motion Video of Crime Found to Distort Perceived Intent</u>, <u>MedicalXpress</u>, Aug. 2016.

A-0377-20

The main article cited by defendants in this regard ("the Caruso study"), involved several experiments that included research participants watching video footage from a murder case and violent contact occurring in broadcast replays of professional football games. Id. at 9251. The Caruso study concluded that playing videos in slow motion, as compared to normal speed, "can cause viewers to perceive an action as more intentional." Id. at 9250. According to the study's authors, this so-called "slow motion intentionality bias" may be attributed to the slow motion causing the research participants "to feel like the actor had more time to act, even when they knew how much clock time had actually elapsed." Ibid. Additional experiments in the Caruso study revealed that "allowing viewers to see both regular speed and slow-motion replay mitigates the [intentionality] bias, but does not eliminate it." Ibid.

Although we appreciate counsel's citation to the Caruso study and other similar literature, and we concur with the trial judge's reaction that it does not appear to be per se unreliable, the context in which the surveillance video footage was replayed in this case—particularly the six-second segment showing the four men quickly walking by the back of Poppie's—assisted the jurors in resolving critical disputed issues of identification. The video shows the physical appearances of the four men, their sizes, their features, and their clothing. The

28

video also shows where each of three alleged culprits were walking in relation to the victim, and what they individually were doing at that time.

The context here is distinguishable from the two experiments that were the subject of the Caruso study because it involves identifying multiple actors and their respective actions. The Caruso study focused on video footage of: (1) a single defendant robbing and shooting a store clerk, and (2) a single football player making disallowed helmet-to-helmet contact with an opposing player. In such contexts, concerns about a slow-motion presentation of the video exaggerating the intentionality of the single actor are likely to be greater. For the single-robber example, a central question for the jury was whether the defendant intended to kill the victim. For the football example, a central question for the referees was whether the sole defender intended to strike the runner's helmet with his own. Intentionality in both examples was at the heart of the matter.

By contrast, it was crucial for this jury to sort out: (1) who were the three men walking with Osbourne behind the deli; and (2) what each person was doing during that segment. The jury had to identify the actors and ascertain what each of them individually appeared to be doing. To be sure, the video was also evidential of the actors' displayed apparent intent to rob Osbourne. But that was

not as vital as identifying who they were and their respective actions in the footage.

Shaquan argues in his brief that the video was potentially influential in affecting how the jury evaluated his degree of involvement in the events at the scene, assuming they found he was one of the men walking in the group. According to the State's interpretation of the video, Shaquan was the last man in the group, and he was not holding the gun pointed at Osbourne or wielding a knife. Shaquan asserts in his brief that "it was clear the jury was attempting to understand what had really happened behind Poppies." He asserts that "[t]he replay of the video showed that the jury was seriously assessing the role [he] played in the robbery." The video segment "would have been crucial to determining whether Shaquan's theory of the case created reasonable doubt that he was involved in the robbery." The video therefore "went to the question of guilt itself, and [the jury] viewing it so many times in slow motion was highly prejudicial."

3.

We are unpersuaded that the trial court misapplied its discretion in granting the deliberating jurors' requests to replay the surveillance video in slow motion and multiple times, with starts and stops. As neither defendant disputes, the video was relevant. Because it showed the perpetrators' physical

appearances, the video evidence would have been helpful in deciding whether defendants resembled the men who took part in the robbery, and whether Osbourne's identification of them and his descriptions of their actions were credible. The slow motion and repeated presentation of the video footage— notably at the request of the deliberating jurors—would have aided the jurors in discerning the appearances of the men who quickly walked by during the key six-second segment. In the circumstances presented, the replays of the video were within the trial court's discretion.[15]

We are likewise unpersuaded by Shaquan's contention that the slow-motion replaying of the video was highly prejudicial to him because "it showed that the jury was seriously assessing the role [he] played in the robbery." The objective of a trial is just that: to have the factfinder "seriously assess" the evidence and assess the conduct of the parties. The video segment was not necessarily at odds with Shaquan's contentions that he was not a central

---

[15] We are mindful that a civil case involving an automobile accident, we found that a plaintiff was unduly prejudiced when the defendant introduced a video simulation of an accident and played it in "extreme slow motion." Suanez v. Egeland, 330 N.J. Super. 190, 193-95 (App. Div. 2000). Among the other issues with the video, we reasoned that viewing the video simulation in such "extreme slow motion" may have affected the jury's perception of the accident. Suanez is distinguishable from the present case for at least two reasons: (1) the video was a simulation created for the adversarial process by an expert and not, as here, real evidence of the actual events; and (2) the case did not involve, as here, a request by deliberating jurors to review a video in slow motion.

participant in a robbery. The video depicts a fourth man, purported to be Shaquan, walking behind the other two culprits and Osbourne. Unlike them, he does not appear to be wielding a gun or pushing Osbourne. We recognize the State argued in summation that in the video Shaquan did not appear to be scared or surprised, a point the defense has not refuted. Nonetheless, to the extent the video had probative value of "intentionality" beyond its bearing upon identification, we conclude it was not unduly prejudicial to Shaquan's interests.

The trial court had the discretion to reject or limit the slow-motion replays, and we defer to its exercise of discretion. The judge prudently required the videos to be replayed under her supervision in the courtroom in the presence of counsel, consistent with the case law governing other kinds of video replays. By agreement of counsel, the videos were not magnified. The six-second segment apparently did not take long to replay, whether it was shown at normal speed or slower speeds. In short, the judge rightly endeavored to support the jurors in their manifest and conscientious effort to understand the proofs and consider them carefully.

We are cognizant that defendants have stressed on appeal the number of times the video was played for the jurors was unduly prejudicial. However, we note that defendants did not object to the prosecutor replaying the video multiple times and in slow motion, with pauses, during closing argument. They only

raised concerns about the slow-motion presentation when the jury requested playbacks.  Given the very short, rapid activity in the six-second segment that is not easy to follow at normal speed, the replays were reasonably allowed.

4.

Defendants argue that, even if we find the slow-motion video replays were not improper, the court was required to provide the jurors with a special cautionary instruction on how to consider such evidence and to not place inordinate weight on them.  Because defendants both failed to make such a request or raise this objection, we consider this issue under a standard of plain error.  State v. Wakefield, 190 N.J. 397, 473 (2007) (citing R. 1:7-2; R. 2:10-2).  In determining whether a trial court's decision or omission constitutes plain error, the reviewing court must determine:  "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' . . . that is whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached[.]'"  State v. Dunbrack, 245 N.J. 531, 544 (2021) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)).

Here, no present case law or model charge specifies jury instructions for the playback of non-testimonial video evidence.  In Miller, the Court remarked that "[j]udges should take precautions to prevent juries from placing undue emphasis on the particular testimony that is replayed" during deliberations.  205

33

N.J. at 123 (emphasis added). "[A]t the time the testimony is repeated, judges should instruct jurors to consider all of the evidence presented and not give undue weight to the testimony played back." Ibid. (emphasis added). This holding is reflected in the Model Jury Charges (Criminal), "Playback of Testimony" (approved Apr. 16, 2012). This rule refers to the playback of witness testimony. There is no similar existing instruction for playback of other forms of video evidence.

As the Miller Court noted, "[a]lthough the trial judge did not give a specific instruction regarding the replayed testimony—as judges should do in the future—the jury charge he delivered the day before directed jurors to consider all of the evidence submitted." 205 N.J. at 126. Similarly, here the trial court generally instructed the jury to consider all the evidence during its general jury charge. Thus, even if the trial court was required to give the jury a separate instruction prior to playing surveillance videos during deliberation, the general jury charge offset any alleged error from the omission. No plain error occurred.

5.

That said, going forward it will be beneficial to trial judges and counsel to have guidance in dealing with the admission of surveillance videos and with requests by deliberating juries to replay surveillance video evidence, and to do

so at modified speeds or with intermittent pauses.  To assist the bench and bar,

we prospectively offer the following non-exclusive factors for consideration:

- Subject to offsetting considerations of undue prejudice or other factors warranting exclusion under N.J.R.E. 403, relevant surveillance video evidence may be presented during a trial or closing argument to jurors in slow motion or at other varying speeds, or with intermittent pauses, if the trial court reasonably finds those modes of presentation would assist the jurors' understanding of the pertinent events and help them resolve disputed factual issues.

- Subject to offsetting considerations of undue prejudice, trial courts have the discretion to grant a jury's requests during deliberations to replay surveillance videos in such modes one or more times, provided that the playbacks occur in open court under the judge's supervision and in the presence of counsel.

- In exercising their discretion in admitting into evidence or allowing the replay of surveillance video recordings, trial courts should consider, among other things, (a) whether the video has a soundtrack that contains recorded statements of the filmed persons; (b) whether the video is difficult to discern when played only at normal speed; (c) whether the video can assist in resolving disputed issues of identification; (d) whether the video bears upon disputed issues of intentionality; (e) whether the video contains content that is particularly disturbing or inflammatory to watch repeatedly in slow motion.

Apart from these non-exclusive factors, we recommend to the Model

Criminal Jury Charge Committee that it consider creating a model charge that

specifically addresses situations in which, as here, a jury requests the replaying

35

of surveillance video evidence, and to caution jurors to afford such evidence only appropriate and not undue weight in comparison with the other evidence at trial.[16] Such a model charge might also usefully draw to the jurors' attention the possibility that viewing such video evidence in slow motion might subconsciously increase their perceptions of an actor's intentionality.[17] The content and contours of charge, if one is adopted, are best developed by the Committee, with the benefit of additional study and the consideration of practices in other jurisdictions.

Having set forth these prospective principles, we affirm the trial court's rulings and its handling of the jury's requests concerning the slow-motion surveillance video replays in this case.

IV.

We turn in this unpublished portion of the opinion to the remaining non-sentencing issues raised by one or both defendants. As we will discuss, none of them warrant reversal.

---

[16]  Of course, there are situations in which the jury rationally determines the video evidence is the most important proof in the case and that it refutes or substantiates the recollections of the testifying witnesses.

[17]  Depending on the fact pattern, the actor whose apparent intention might be interpreted from the video footage could be someone other the defendant, such as the alleged aggressor in a case involving a claim of self-defense.

Defendants argue the trial court erred in admitting at trial Osbourne's earlier testimony from the Wade hearing. We are satisfied the trial court did not misapply its discretion on this evidentiary ruling. A court's evidentiary rulings are reviewed under a deferential standard and generally will be upheld absent a showing of an abuse of discretion. State v. Sims, 250 N.J. 189, 218 (2022). The admission of Osbourne's pretrial testimony was clearly authorized under the former testimony exception to the hearsay rules, N.J.R.E. 804(b)(1)(A). The trial court reasonably determined that Osbourne's death made him an unavailable witness and that defendants had an opportunity and similar motive to cross-examine him at the Wade hearing.

Although the trial court initially imposed some limits on defense counsel's cross examination of Osbourne at the Wade hearing, counsel managed to delve into a considerable breadth of subject matters beyond his identifications of the robbers. We are unpersuaded that defense counsel were deprived of a fair opportunity to cross-examine Osbourne to undermine his credibility, or that counsel's motives in impeaching him at the hearing were dissimilar to what they would have been if he had taken the witness stand at trial.

The opportunity for cross-examination negates defendants' parallel arguments under the Confrontation Clause. As the United States Supreme Court

underscored in <u>Delaware v. Fensterer</u>, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." 474 U.S. 15, 20 (1985); <u>see also</u> <u>Sims</u>, 250 N.J. at 223 (quoting the same passage).

We concur with the trial court in rejecting defendants' arguments that they learned additional information after the <u>Wade</u> hearing that would have materially affected their cross-examination of Osbourne. The State's post-hearing turnover to the defense of the police officers' body camera footage, and the lack of notes from their questioning of Osbourne at the deli, did not render his hearing testimony inadmissible. At trial, defendants cross-examined the officers who had questioned Osbourne. The defense also questioned Osbourne at the <u>Wade</u> hearing, albeit more generally, about his conversations with other officers at Poppie's.

Defense counsel also had the opportunity at the <u>Wade</u> hearing to cross-examine Osbourne about the Poppie's surveillance video and his purchasing drugs from Shaquan. This line of inquiry also provided the defense with useful grounds to impeach Osbourne at trial.

In sum, the trial court acted within its discretion and in accordance with the Confrontation Clause in admitting Osbourne's former testimony at trial.

B.

As another evidentiary point, defendants contend the trial court erred in admitting into evidence a recording of the 9-1-1 call that Osbourne made to the police about three minutes after the robbery. The trial court properly deemed the call to be an admissible excited utterance under N.J.R.E. 803(c)(2), which allows a hearsay statement to be admitted if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." These elements are manifestly present here. Osbourne placed the call only a few minutes after the very startling event of the robbery, in which he was threatened with what seemed to be one or more deadly weapons. Under the circumstances, he did not have sufficient time to deliberate or to conjure a false narrative.

We also discern no violation of the Confrontation Clause in the admission of the 9-1-1 recording. The call was not "testimonial," as that pivotal concept has been construed in Crawford v. Washington, 541 U.S. 36, 54-55 (2004), and its progeny. Osbourne's call for help was made to address an ongoing emergency in the wake of a fresh robbery by culprits who ran away. The context fits the "emergency doctrine" of Confrontation Clause jurisprudence, as explicated by the Supreme Court in Davis v. Washington, 547 U.S. 813, 822 (2006), and Michigan v. Bryant, 562 U.S. 344, 357-71 (2011).

A-0377-20

## C.

Although he is not joined by Fuquan on this argument, Shaquan contends the court's jury instruction on identification was deficient because it did not address three points: (1) the use of "fillers," meaning showing a witness a lineup that includes at least five other individuals, in addition to the suspect; (2) the use of a blind administrator, meaning using an officer to administer the identification who is both unfamiliar with the case and the suspect, so as not to subconsciously influence the witness's selection; and (3) the use of a "showup," in which the witness is shown only one suspect to identify. In addition, the trial court took judicial notice that there were no Attorney General Guidelines about "one-on-one" identification procedures which, Shaquan argues, compounded the erroneous lack of instruction.

We conclude that, under present standards, the trial court did not err in its jury charge on identification, and even if there was error, it was harmless and does not support reversal.

At the Wade hearing, the trial court ruled that Osbourne's out-of-court identifications of Shaquan and Fuquan, which were provided through one-on-one identification procedures, were admissible because Osbourne testified that he was familiar with defendants, and the Poppie's surveillance video reflected that familiarity as well. Osbourne had expressed familiarity with Shaquan and

40

Fuquan, and identified them from the surveillance videos, but did not remember their names. Detective Lantigua also recognized Shaquan and Fuquan, and thus collected their photographs and presented them to Osbourne, as a one-on-one photo array. Because Osbourne did not know Kyler, Kyler's identification procedure consisted of a six-photograph array using a blind administrator, which according to Lantigua, was consistent with the Attorney General Guidelines on photographic arrays. Osbourne identified Kyler's photograph from this array.

Shaquan's attorney attempted to cross-examine Lantigua on whether the one-on-one array also complied with the Attorney General Guidelines. The State objected, and during a sidebar, requested judicial notice that one-on-one photo arrays "are not considered identifications and that's why they're not covered by the Attorney General Guidelines because its [sic] separate and apart from it." The court agreed, stating that the Attorney General Guidelines were drafted in response to case law for situations where the witness was not familiar with the suspect. Shaquan's attorney agreed with the court but said it was nevertheless appropriate for him to question Lantigua about his use of a one-on-one identification. The State requested some sort of "curative instruction" in response to defense counsel's questioning. To address this point, the court took judicial notice that "there is no Attorney General Guideline that exists pertaining

41

to . . . the necessity or use of array of photos when the victim has a familiarity with the suspect."

Later on, when discussing the jury charge, the State agreed that the jury instructions should include general language about double-blind administrators, line-up composition, and fillers since they related to Osbourne's identification of Kyler's photograph. However, the parties disputed whether a certain instruction should be included. See Model Jury Charges (Criminal), "Identification: Out-of-Court Identification," at 7-8 (rev. May 18, 2020).

The parties' dispute apparently centered on instructions for when a blind administrator is not used. The court agreed with the State that this language was not necessary because the use of blind administrators pertained to lineups, not the single photo array shown to Osbourne.

During its jury charge, the court generally, but not precisely, followed the Model Jury Charges, providing instruction on identification evidence, including whether the identification occurred by way of a lineup, the composition of the lineup, the number of photographs presented, whether the lineup involved a double-blind administrator, and whether the administrator instructed the witness that the suspect may not be part of the array. The court also reminded the jury that it had taken judicial notice that no Attorney General Guideline requires a photographic array when the witness is familiar with the suspect. The court did

42

not provide any instruction on showups, and excluded the language about when a blind administrator is not used.  Id. at 7-8.

Shaquan's arguments are without merit.  The court's instruction did in fact include a general instruction about the use of fillers and blind administrators. Shaquan is correct that the court did strike the portion of the Model Jury Charges (Criminal), "Identification:  Out-of-Court Identification," at 7-8, labeled as "CHARGE IF BLIND ADMINISTRATOR IS NOT USED."  However, this exclusion was proper, as a blind administrator is not required for a one-on-one identification.  See State v. Henderson, 208 N.J. 208, 259 (2011) ("By their nature, showups are suggestive and cannot be performed blind or double-blind.").  Thus, Shaquan's arguments on these points are without merit.

The court did not instruct the jury about the police use of a showup.  Such an instruction was unnecessary here given the kind of identification involved.

"Showups are essentially single-person lineups:  a single suspect is presented to a witness to make an identification."  Henderson, 208 N.J. at 259. They often take place "at the scene of a crime soon after its commission."  Ibid. A showup can be "inherently suggestive."  Watson, 254 N.J. at 579 (quoting State v. Herrera, 187 N.J. 493, 504 (2006)).  This is because showups "fail to provide a safeguard against witnesses with poor memories or those inclined to guess, because every mistaken identification in a showup will point to the

43

suspect." Henderson, 208 N.J. at 260. Nevertheless, showup procedures are still permissible and supported because: (1) "[t]hey are likely to be accurate, taking place, as they do, before memory has faded"; (2) "[t]hey facilitate and enhance fast and effective police action; and (3) they tend to avoid or minimize inconvenience and embarrassment on the innocent." State v. Wilson, 362 N.J. Super. 319, 327 (2003) (quoting Wilkerson, 60 N.J. at 461).

A showup in which the witness is familiar with the suspect, however, may not involve the same danger of suggestion. See, e.g., Herrera, 187 N.J. at 496-97, 507 (in which a victim of an assault and carjacking identified the defendant through a showup at a hospital emergency room, but the Court held the victim's identification was nonetheless reliable because the victim told the police that he "had observed defendant in the area almost daily, but did not know defendant's name").

Similarly, confirmatory identifications generally are not viewed as unduly suggestive. State v. Pressley, 232 N.J. 587, 592 (2018). A confirmatory identification takes place "when a witness identifies someone he or she knows from before but cannot identify by name." Id. at 592-93 (citing National Research Council, Identifying the Culprit: Assessing Eyewitness Identification 28 (2014)). This can include a neighbor or "someone known only by a street name." Id. at 593.

Here, neither party nor the court referred to Osbourne's identification as a "confirmatory identification." However, this characterization is implicit from the court's ruling that the use of a one-on-one identification was appropriate, given Osbourne's familiarity with Shaquan and Fuquan. Moreover, on appeal, Shaquan does not dispute that this was a confirmatory identification; rather he argues that the procedure was improper "even if" it was a confirmatory identification. Consequently, in framing its jury instruction, the court did not err in implicitly characterizing this as a confirmatory identification, which permits a one-on-one identification.

The Model Jury Charges on showups do not clearly apply to such confirmatory identifications. Model Jury Charges (Criminal), "Identification: Out-of-Court Identification," at 6. The jury charge was not on point here, because Osbourne's identification of Shaquan was more akin to a confirmatory identification than to a showup. The trial court's omission of the model instruction on showups did not comprise plain error. R. 2:10-2.

Moreover, any error was harmless because the jury instruction the court provided conceptually addressed concerns of suggestibility. The trial court instructed the jury to: carefully scrutinize the evidence; consider the victim's confidence and accuracy; assess the suggestiveness of the procedure (including use of fillers and a double-blind administrator); consider the adequacy of pre-

identification instructions to the witness; and weigh any other factor the jury viewed as relevant. The only relevant language not included was that specific to showups, but the language on the suggestiveness of the procedure noted that concern as well.

Finally, contrary to Shaquan's contention, the court did not err in instructing the jury that the Attorney General Guidelines outlining identification procedures do not apply to one-on-one confirmatory identifications. See Bayer v. Twp. of Union, 414 N.J. Super. 238, 265 (App. Div. 2010) (noting that although "the guidelines apply to both photographic and live lineups, they do not specifically address showups"). Indisputably, the Guidelines make no reference to showups or one-on-one identifications. Attorney General Guidelines for Preparing and Conducting Out-of-Court Eyewitness Identifications (Feb. 9, 2021). Hence, the trial judge's understanding was correct, and this issue provides no basis for reversal. Although it may have been superfluous for the court to advise the jury about what the Guidelines do not contain, we discern no harmful error stemming from that disclosure.

D.

Defendants argue the trial court erred in not taking what they now characterize as a "partial verdict" from the jury after it submitted a note in the afternoon of its final day of deliberations. The pertinent sequence of events

46

shows that the court did not abuse its discretion in the manner it proceeded after receiving that note.

The court mentioned the time frame for trial at several points during the proceeding. First, during jury selection, the court apprised prospective jurors about its anticipated completion date, stating that if the case were completed by November 21, 2019, deliberations likely would commence on November 22, 2019. However, one potential juror asked the court if deliberations would be completed by December 6, and the court responded "Yes." Second, after trial commenced, the court had to cancel a trial date, and notified the jury that they would come back after Thanksgiving, on December 3, 2019. A juror then asked the court, "But we're still good for December 6th?" and the court responded "Yes."

Deliberations began on December 5, 2019. Later that day, Juror Number Fourteen notified the court that she had a flight for work "tomorrow morning at nine a.m." because "[h]er boss thought she was done December 6th." The court stated that it had sent a note to the jurors' employers, outlining the length of the trial, which included December 6, 2019.[18] The court directed Juror Number Fourteen to speak to her employer, adding that it would not be able to excuse

---

[18] A copy of this note was not submitted with the record on appeal.

her. After speaking with her employer, the juror stated that her flight actually was not until 8:00 p.m. and asked if that was acceptable to the court. The court responded, "Perfect."

On December 6, 2019, the jury continued its deliberations. That afternoon, at 3:26 p.m., the court stated on the record that it had received a note from the jury at 3:08 p.m. The note read as follows: "We are at a standstill on one of the charges. What happens if we cannot come to a decision on that charge?"

The State requested that the court issue a "modified Allen[19] charge," noting that although the jury had been deliberating for only "approximately three to four hours," "given the circumstances" the charge was appropriate. Fuquan's attorney objected, saying that it was a "dynamite charge" which usually works against defendants, and given the time—it was close to 4:00 p.m., with Juror Number Fourteen taking an 8:00 p.m. flight—the court should accept a verdict on counts that were not in standstill. Shaquan's attorney advocated for the court to accept a partial verdict, noting that this was "the last day we gave the jurors" and it was 3:30 p.m.

---

[19] Allen v. United States, 164 U.S. 492 (1896).

A-0377-20

The court called the jury in and informed them that it was premature for it to instruct the jury on what to do if it could not reach a decision on a particular charge. The court then gave the following instruction:

> It is your duty as jurors to consult with one another and to deliberate with a view towards reaching a verdict, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your . . . fellow jurors, or for the mere purpose of returning a verdict.
>
> . . . .
>
> You are not partisans. You are judges; judges of the facts. I would ask you to go back in and see if you can continue your deliberations and let us know. [20]

After receiving this instruction, the jury left the courtroom at 3:33 p.m. to resume its deliberations. The court returned to the record at 4:00 p.m. with a note from the jury stating that it had reached a verdict. The verdict was then delivered in open court, and the jurors were unanimous on all counts.

---

[20] The court initially had informed the jury that they are "partisans," and then corrected itself. This excerpt reflects the entirety of the court's instruction, omitting the misstatement and a sidebar correcting the same.

Defendants contend the court erred in directing the jury to continue its deliberations, and it instead should have taken a partial verdict after receiving the jury's note. We are obligated to evaluate this argument with a substantial degree of deference to the trial court.

A trial judge's decision in handling jury issues is generally reviewed for abuse of discretion. State v. R.D., 169 N.J. 551, 559-60 (2001). This includes the question of whether supplemental charges should be given to a deadlocked jury. State v. Figueroa, 190 N.J. 219, 234-35 (2007).

In cases involving multiple counts of an indictment or multiple defendants tried together, a trial court may accept a partial verdict "specifying the counts on which [the jury] has agreed." R. 3:19-1(a). While the "routine use of partial verdicts" is discouraged, trial courts nonetheless "possess the discretion to accept such verdicts absent a showing of prejudice to the defendant." State v. Shomo, 129 N.J. 248, 257 (1992). Partial verdicts may be appropriate

> when the jury has deliberated at length, when the charges against a defendant are rooted in unrelated facts, when the court has reason to be concerned that a juror may become ill before deliberations conclude, when there is risk of taint to the jury's decision-making process, or when the State has indicated its intention to dismiss the unresolved counts.
>
> [Id. at 257-58.]

Having considered this discretionary option of a partial verdict and the sequence of events, we conclude the court did not abuse its discretion in allowing the jury more time to deliberate. First, the jury had been deliberating for, at most, a day-and-a-half, a period of time that is not so extensive that it mandates cessation of deliberations. See Figueroa, 190 N.J. at 239-40 (while the court's instruction was faulty, finding no error in the court's decision to direct the jury to continue deliberating, where the jury had been deliberating for a day at most). The deliberations had not yet been "at length," as set forth under the partial verdict rule.

Second, although the jury said it was at a "standstill" on one count, it did not say that it would be unable to reach a verdict; rather, it inquired hypothetically what would happen if they could not reach a verdict on that count. Such a situation, where the jury poses an "ambiguous question that suggested but did not announce a deadlock," can appropriately result in a supplemental charge from the court directing continued deliberations. Figueroa, 190 N.J. at 239 (finding that the jury's note, stating that it could not "unanimously agree on the verdict," was "relatively benign" and did not constitute an unambiguous pronouncement of a deadlock).

Third, because it was only the jury's first note on this point, the court had the prerogative to instruct the jury to continue deliberations. Ibid.; see, e.g.,

51

State v. Czachor, 82 N.J. 392, 407 (1980) (discussing circumstances when repeat instructions would be inappropriate).

We are mindful the trial court seemingly had conveyed a time limit on the case, including in the note to the jurors' employers, identifying December 6, 2019, as the last anticipated trial date. Notwithstanding this, there are insufficient grounds to speculate that this projected endpoint unduly influenced the jury. It is unclear whether the other jurors knew about Juror Number Fourteen's flight on the evening of December 6, as that conversation with the judge happened outside the presence of the entire jury. The transcript also does not reflect that the juror expressed to the court that she felt coerced or pressured because of the timing. In addition, the court made no mention of the time frame when instructing the jury.

Given our limited scope of review, we conclude the trial court did not abuse its discretion in directing the jury to continue deliberations after receiving its note. There was no obligation to take a partial verdict.

### E.

None of the other points or sub-points argued by either defendant to set aside his conviction, including the claim of cumulative error, have sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(2).

### V.

A-0377-20

Defendants each argue their sentence was excessive. As we noted above, the court imposed an aggregate sixteen-year NERA sentence on Fuquan, and an eleven-year NERA sentence on Shaquan. By comparison, their father, Kyler, who pled guilty to two of the four charges against him, accepted a plea agreement that resulted in him receiving a shorter sentence of six years.

The court noted that Fuquan had two "prior indictable adjudications," one juvenile adjudication, and fourteen adult arrests. It found mitigating factor thirteen (youthful defendant's influence by a more mature individual), N.J.S.A. 2C:44(b)(13), noting Kyler's involvement and stating that "it is certainly very difficult to go against your parent's wishes." The court rejected the application of mitigating factor eleven (excessive hardship), N.J.S.A. 2C:44(b)(11), which defendant argued applied because he had a two-year-old daughter, and any prolonged incarceration would result in his missing the entirety of her childhood. Acknowledging this fact, the court found that Fuquan's situation was "no different than any other person that unfortunately has chosen . . . to violate the law." Citing Fuquan's criminal history, the court found aggravating factor three (risk of reoffending), N.J.S.A. 2C:44(a)(3), and aggravating factor nine (deterrence), N.J.S.A. 2C:44(a)(9).

The court merged count one (second-degree conspiracy to commit a robbery) with count two (first-degree robbery), and imposed on Fuquan a term

of sixteen years, subject to NERA with eighty-five percent parole ineligibility. The court disagreed that count three (third-degree unlawful possession of a weapon) merged with the other two counts, and sentenced defendant to five years with forty-two months parole ineligibility, pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), to run concurrent with count two of the indictment. The court then merged count four (second-degree unlawful possession of a weapon) with count two.

On appeal, Fuquan argues that his sentence was excessive, citing the disparity between the plea offer the State extended to him and the sentence, the adverse influence of Kyler, and the disparity between his sentence and Shaquan's.

Shaquan, meanwhile, contends his own sentence was unfairly affected by the plea negotiations, in which his ability to accept a plea offer was contingent on his older brother agreeing to plead guilty as well. The relevant chronology is as follows.

In October 2019, before deciding the Wade issue, the court inquired whether the parties had reached a plea agreement. Shaquan's attorney responded that he had a "contingent offer"—meaning his ability to accept the offer was contingent upon Fuquan's accepting his offer as well—and thus could not "do anything." Fuquan rejected the plea offer.

54

After ruling on the <u>Wade</u> hearing, the court noted the current plea offer from the State was eleven years for Fuquan and seven years for Shaquan. Shaquan's attorney again noted that this offer was "contingent." The court said the parties had until the end of day to decide, and there was no further discussion of this on the record.

At sentencing in 2020, the court first noted that Shaquan had one prior indictable offense, four prior disorderly persons convictions, eleven adult arrests, and six juvenile adjudications. Shaquan argued for a downward departure, imposing a sentence for a second-degree crime instead of a first-degree crime, citing his age and his role in the robbery. The court denied this application, because the mitigating factors did not "drastically outweigh" the aggravating factors.

In making this assessment, the court found mitigating factor thirteen (youthful defendant's influence by a more mature individual), N.J.S.A. 2C:44(b)(13), citing Shaquan's age at the time of arrest (he was nineteen years old) and Kyler's "undue influence on his children." However, the court rejected the application of all other mitigating factors argued by Shaquan. Specifically, it rejected mitigating factor seven (prior criminal history), N.J.S.A. 2C:44(b)(7), and mitigating factor eight (circumstances unlikely to reoccur), N.J.S.A. 2C:44(b)(8), citing Shaquan's history. While the court acknowledged that

Shaquan was nineteen years old at the time of the robbery, and that his "frontal lobe" was still developing and could result in changed behavior in the future, the court viewed this as unlikely, given his past history demonstrating a "continuous pattern" of criminal behavior.[21] The court also rejected the application of mitigating factor nine (likelihood of reoffending), N.J.S.A. 2C:44(b)(9), finding there was nothing to support this conclusion. It similarly rejected mitigating factor ten (possibility of successful probation), N.J.S.A. 2C:44(b)(10), noting that Shaquan had violated probation as a juvenile. Next, citing Shaquan's criminal history, the court found aggravating factor three (risk of reoffending), N.J.S.A. 2C:44(a)(3), and aggravating factor nine (deterrence), N.J.S.A. 2C:44(a)(9).

Prior to sentencing Shaquan, the court merged count one (second-degree conspiracy to commit robbery) with count two (first-degree robbery). As we have already noted, the court sentenced him to eleven years' incarceration, subject to a NERA eighty-five percent parole-bar.

---

[21] The court's analysis on this point is similar to the recently added statutory mitigating factor fourteen, whether the defendant was under the age of twenty-six at the time of the offense. N.J.S.A. 2C:44-1(b)(14). However, this factor was not in effect at the time of Shaquan's sentencing. L. 2020, c. 110 (eff. Oct. 19, 2020); see also State v. Lane, 251 N.J. 84 (2022) (rejecting a defendant's claim the statute is retroactive).

Considering defendants' sentences in tandem, we recognize that on appeal we generally afford trial courts considerable deference and discretion in calibrating sentences.  State v. Roth, 95 N.J. 334, 365-66 (1984).  "[A]ppellate courts are cautioned not to substitute their judgment for those of our sentencing courts."  State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594 (2013)).

That said, we are persuaded that it is appropriate to remand these matters, solely for resentencing, for several reasons.  First, it is uncertain from the record if the sentencing court took fairly into account the degree of disparity between defendants' respective NERA sentences of eighteen and eleven years and the six-year sentence imposed on their father—who the videos and other evidence show participating with them in the robbery.  We are mindful that the father pled guilty to lesser charges.  Even so, we believe the overall sentences of the brothers as compared with their father should be considered more closely on remand.

Additionally, we also remand for the trial court to take more expressly into account the difficulty Shaquan apparently faced in being unable to accept the State's six-year plea offer unless and until his brother likewise pled guilty.  To be sure, it is not argued that the State is precluded from making contingent plea offers to related co-defendants.  Even so, the fairness of Shaquan's receipt

of a sentence that nearly doubled his exposure under the plea offer he allegedly had no ability to accept warrants further scrutiny.

Lastly, Fuquan argues his sentence is disproportionately longer than that of Shaquan, without justification. He argues the disparity is unfair because he contends that, despite Shaquan being his younger brother, the latter was more culpable in instigating the robbery. Shaquan, meanwhile, contends that Fuquan was more culpable. On remand, the trial court should reexamine these competing characterizations and reconsider whether the seven-year disparity in the two brothers' sentences remains justified.

Disparity in sentencing between co-defendants "may invalidate an otherwise sound and lawful sentence." State v. Roach, 146 N.J. 208, 232 (1996) (citing State v. Hicks, 54 N.J. 390, 392 (1969)). On one hand, "a sentence of one defendant not otherwise excessive is not erroneous merely because a co-defendant's sentence is lighter." Hicks, 54 N.J. at 391. Nevertheless, even where a "sentence imposed on defendant falls within the statutory limits mandated for the offense, 'there is an obvious sense of unfairness in having disparate punishments for equally culpable perpetrators.'" Roach, 146 N.J. at 232 (quoting State v. Hubbard, 176 N.J. Super. 174, 175 (Resentencing Panel 1980)). Thus, the question "is whether the disparity is justifiable or unjustifiable." Id. at 233.

When determining a sentence for similarly situated co-defendants, the "sentencing court must exercise a broader discretion to obviate excessive disparity." Ibid. The court must: (1) assess whether the co-defendants are identical or substantially similar in terms of sentencing criteria; (2) examine the basis of the sentences imposed on the first defendant; and (3) consider the length, terms, and conditions of the co-defendant's sentence. Ibid. If the sentencing court concludes that the defendants are "sufficiently similar," then it "must give the sentence imposed on the co-defendant substantive weight when sentencing the defendant in order to avoid excessive disparity." Ibid. This procedure, the Court said, "will accommodate the basic discretion of a sentencing court to impose a just sentence on the individual defendant in accordance with the sentencing guidelines while fulfilling the court's responsibility to achieve uniform sentencing when that is possible." Id. at 233-34.

We remand for resentencing to afford the trial court a fresh opportunity to apply these principles to these co-defendant siblings.

## VI.

Affirmed as to both convictions, but remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0377-20